Opinion for the court filed by Circuit Judge LOURIE.
Opinion concurring in part, dissenting in part filed by Circuit Judge NEWMAN.
Opinion dissenting in part filed by Circuit Judge CHEN.
LOURIE, Circuit Judge.
This appeal presents issues of first impression relating to the Biologies Price Competition and Innovation Act of 2009 (“BPCIA”), Pub.L. No. 111-148, §§ 7001-7003, 124 Stat. 119, 804-21 (2010). Amgen Inc. and Amgen Manufacturing Ltd. (collectively, “Amgen”) appeal from the decision of the United States District Court for the Northern District of California (1) dismissing Amgen’s state law claims of unfair *1351 competition and conversion with prejudice because Sandoz Inc. (“Sandoz”) did not violate the information-disclosure and notice-of-commercial-marketing provisions of the BPCIA, respectively codified at 42 U.S.C. § 262(i )(2)(A) and (Z)(8)(A); (2) granting judgment on the pleadings to Sandoz on its counterclaims seeking a declaratory judgment that it correctly interpreted the BPCIA; and (3) denying Am-gen’s motion for a preliminary injunction based on its state law claims. Amgen Inc. v. Sandoz Inc., No. 14-cv-04741, 2015 WL 1264756 (N.D.Cal. Mar. 19, 2015) (“Opinion ”).
For the reasons stated below, we affirm the dismissal of Amgen’s state law claims of unfair competition and conversion, vacate the judgment on Sandoz’s counterclaims and direct the district court to enter judgment consistent with our interpretation of the BPCIA, and remand for further proceedings consistent with this opinion.
A. BACKGROUND
I.
In 2010, as part of the Patient Protection and Affordable Care Act, Congress enacted the BPCIA,[1] which established an abbreviated pathway for regulatory approval of follow-on biological products that are “highly similar” to a previously approved product (“reference product”). Pub.L. No. 111-148, §§ 7001-7003, 124 Stat. 119, 804-21 (2010) (codified as amended at 42 U.S.C. § 262, 35 U.S.C. § 271(e), 28 U.S.C. § 2201(b), 21 U.S.C. § 355 et seq.). Congress established such “a biosimilar pathway balancing innovation and consumer interests.” BPCIA, Pub.L. No. 111-148, § 7001(b), 124 Stat. at 804.
The BPCIA has certain similarities in its goals and procedures to the Drug Price Competition and Patent Term Restoration Act of 1984 (the Hateh-Waxman Act), Pub.L. No. 98-417, 98 Stat. 1585 (1984), but it has several obvious differences. We note this as a matter of historical interest, but otherwise do not comment on those similarities and differences.
Traditionally, the Food and Drug Administration (“FDA”) approves a biological product for commercial marketing by granting a biologies license under 42 U.S.C. § 262(a). An applicant filing a bio-logies license application (“BLA”) typically provides clinical data to demonstrate the safety and efficacy of its product. In contrast, under the abbreviated pathway created by the BPCIA, codified at 42 U.S.C. § 262(k), an applicant filing an abbreviated biologies license application (“aBLA” or “subsection (k) application”) instead submits information to demonstrate that its product is “biosimilar” to or “interchangeable” with a previously approved reference product, together with “publicly-available information regarding the [FDAj’s previous determination that the reference product is safe, pure, and potent.” 42 U.S.C. § 262(k)(2)-(5); see also id. § 262(i). The BPCIA thus permits a biosimilar applicant to rely in part on the approved license of a reference product.
To balance innovation and price competition, Congress enacted the BPCIA to provide a four-year and a twelve-year exclusivity period to a reference product, both beginning on the date of first licensure of the reference product. Specifically, a subsection (k) application “may not be submitted to the Secretary.until the date that is 4 years after the date on which the refer *1352 ence product was first licensed under subsection (a),” id. § 262(k)(7)(B), and approval of a subsection (k) application “may not be made effective by the Secretary until the date that is 12 years after the date on which the reference product was first licensed under subsection (a),” id. § 262(k)(7)(A). Thus, a sponsor of an approved reference product (the “reference product sponsor” or “RPS”) receives up to twelve years of exclusivity against follow-on products, regardless of patent protection.
Moreover, the BPCIA established a patent-dispute-resolution regime by amending Titles 28, 35, and 42 of the United States Code. The BPCIA amended the Patent Act to create an artificial “act of infringement” and to allow infringement suits based on a biosimilar application prior to FDA approval and prior to marketing of the biological product. See 35 U.S.C. § 271(e)(2)(C), (e)(4), (e)(6). The BPCIA also established a unique and elaborate process for information exchange between the biosimilar applicant and the RPS to resolve patent disputes. See 42 U.S.C. § 262(i).
Under that process, codified at 42 U.S.C. § 262(0, the biosimilar applicant grants the RPS confidential access to its aBLA and the manufacturing information regarding the biosimilar product no later than 20 days after the FDA accepts its application for review. Id. § 262(£ )(l)-(2). The parties then exchange lists of patents for which they believe a claim of patent infringement could reasonably be asserted by the RPS, as well as their respective positions on infringement, validity, and enforceability of those patents. Id. § 262(0(3). Following that exchange, which could take up to six months, the parties negotiate to formulate a list of patents (“listed patents”) that would be the subject of an immediate infringement action, id. § 262(i )(4)-(5), and the RPS then sues the biosimilar applicant within 30 days, id. § 262(i )(6). That information exchange and negotiation thus contemplates an immediate infringement action brought by the RPS based only on listed patents.
Subsection 262(i) also provides that the applicant give notice of commercial marketing to the RPS at least 180 days prior to commercial marketing of its product licensed under subsection (k), which then allows the RPS a period of time to seek a preliminary injunction based on patents that the parties initially identified during information exchange but were not selected for the immediate infringement action, as well as any newly issued or licensed patents (collectively, “non-listed patents”). Id. § 262(Z)(7)-(8).
Subsection 262(Z) additionally provides, in paragraph (l )(9)(A), that if the applicant discloses the information “required under paragraph (2)(A),” then neither the RPS nor the applicant may bring a declaratory judgment action based on the non-listed patents prior to the date on which the RPS receives the notice of commercial marketing under paragraph (l )(8)(A). Id. § 262(i )(9)(A). Paragraphs (i)(9)(B) and (i)(9)(C), however, permit the RPS, but not the applicant, to seek declaratory relief in the event 'that the applicant fails to comply with certain provisions of subsection (l). Id. § 262(l )(9)(B)-(C).
II.
Amgen has marketed filgrastim under the brand name Neupogen® (“Neupogen”) since 1991. In May 2014, Sandoz filed an aBLA, seeking FDA approval of a biosimi-lar filgrastim product, for which Neupogen is the reference product. On July 7, 2014, Sandoz received notification from the FDA that it had accepted Sandoz’s application for review.
On July 8, 2014, Sandoz notified Amgen that it had filed a biosimilar application referencing Neupogen; that it believed *1353 that the application would be approved in “Ql/2 of 2015”; and that it intended to launch its biosimilar product immediately upon FDA approval. J.A. 1472. Later in July, in response to Amgen’s inquiry, San-doz confirmed that the FDA had accepted its application for review, but Sandoz informed Amgen that it had “opted not to provide Amgen with Sandoz’s biosimilar application within 20 days of the FDA’s notification of acceptance” and that Amgen was entitled to sue Sandoz under § 262(0(9X0. J.A. 1495-96. Sandoz thus did not disclose its aBLA or its product’s manufacturing information to Amgen according to § 262(Z )(2)(A).
Subsequently, on March 6, 2015, the FDA approved Sandoz’s aBLA for all approved uses of Amgen’s Neupogen. Although Sandoz has maintained that it gave an operative notice of commercial marketing in July 2014, it nevertheless gave a “further notice of commercial marketing” to Amgen on the date of FDA approval. J.A. 1774. Sandoz intended to launch its filgrastim product under the trade name Zarxio.
III.
In October 2014, Amgen sued Sandoz in the Northern District of California, asserting claims of (1) unfair competition for unlawful business practices under California Business & Professions Code § 17200 et seq. (“UCL”), based on two alleged violations of the BPCIA; (2) conversion for allegedly wrongful use of Amgen’s approved license on Neupogen; and (3) infringement of Amgen’s U.S. Patent 6,162,-427 (the “’427 patent”), which claims a method of using filgrastim. Amgen alleged that Sandoz violated the BPCIA by failing to disclose the required information under § 262(Z )(2)(A) and by giving a premature, ineffective, notice of commercial marketing under § 262(Z)(8)(A) before FDA approval of its biosimilar product. Sandoz counterclaimed for a declaratory judgment that it correctly interpreted the BPCIA as permitting its actions, and that the '427 patent was invalid and not infringed.
In January 2015, the parties filed cross-motions for judgment on the pleadings on Amgen’s state law claims and Sandoz’s counterclaims interpreting the BPCIA. In February 2015, Amgen also filed a motion for a preliminary injunction based solely on its state law claims to enjoin Sandoz from launching Zarxio after FDA approval. Also in February 2015, through discovery, Amgen obtained access to Sandoz’s biosimilar application.
On March 19, 2015, the district court granted partial judgment on the pleadings to Sandoz on its BPCIA counterclaims to the extent that Sandoz’s interpretation of the statute is consistent with the court’s interpretation. Specifically, the district court concluded that: (1) the BPCIA renders permissible a subsection (k) applicant’s decision not to disclose its aBLA and the manufacturing information to the RPS, subject only to the consequences set forth in 42 U.S.C. § 262(Z )(9)(C); (2) such a decision alone does not offer a basis for the RPS to obtain injunctive relief, restitution, or damages against the applicant; and (3) the applicant may give notice of commercial marketing under § 262(Z)(8)(A) before FDA approval. Opinion, 2015 WL 1264756, at *8, *11.
Based on its interpretation of the BPCIA, the district court then dismissed Amgen’s unfair competition and conversion claims with prejudice because it concluded that Sandoz did not violate the BPCIA or act unlawfully. Id. at *8-9. The court also denied Amgen’s motion for a preliminary injunction based on its state law claims, noting that Amgen “has yet to proceed on its remaining claim for patent infringement.” Id. at *10.
On the parties’ joint motion, the district court entered final judgment as to Am- *1354 gen’s unfair competition and conversion claims and as to Sandoz’s BPCIA counterclaims under Rule 54(b) of the Federal Rules of Civil Procedure. The parties’ claims and counterclaims relating to infringement, validity, and enforceability of the '427 patent remain pending at the district court.
Amgen timely appealed from the final judgment and from the denial of a preliminary injunction; we have jurisdiction under 28 U.S.C. § 1295(a)(1) and § 1292(a)(1) and (c)(1).
B. Discussion
We apply the procedural law of the regional circuit, here the Ninth Circuit, when reviewing a district court’s grant of a motion for judgment on the pleadings. Merck & Co. v. Hi-Tech Pharmacal Co., 482 F.3d 1317, 1320 (Fed.Cir.2007). The Ninth Circuit reviews the grant of judgment on the pleadings de novo, Peterson v. California, 604 F.3d 1166, 1169 (9th Cir. 2010), and “accept[s] all material allegations in the complaint as true and construe[s] them in the light most favorable to [the non-moving party],” Turner v. Cook, 362 F.3d 1219, 1225 (9th Cir.2004) (third alteration in original). Issues of statutory interpretation are also reviewed de novo. Qantas Airways Ltd. v. United States, 62 F.3d 385, 387 (Fed.Cir.1995).
Because Amgen’s state law claims of unfair competition and conversion are premised on the proper interpretation of the BPCIA, we first, interpret the relevant provisions of the BPCIA and then consider Amgen’s state law claims in light of that interpretation.
I.
We first consider whether the district court erred in concluding that a subsection (k) applicant may elect not to disclose its aBLA and the manufacturing information under 42 U.S.C.
§ 262(i )(2)(A), subject only to the consequences set forth in § 262(Z )(9)(C). Paragraph (l )(2)(A) provides that:
Not later than 20 days after the Secretary notifies the subsection (k) applicant that the application has been accepted for review, the subsection (k) applicant shall provide to the reference product sponsor a copy of the application submitted to the Secretary under subsection (k), and such other information that describes the process or processes used to manufacture the biological product that is the subject of such application....
42 U.S.C. § 262(i)(2)(A) (emphasis added). Paragraph (l )(9)(C) provides that:
If a subsection (k) applicant fails to provide the application and information required under paragraph (2) (A), the reference product sponsor, but not the subsection (k) applicant, may bring an action under section 2201 of Title 28, for a declaration of infringement, validity, or enforceability of any patent that claims the biological product or a use of the biological product.
Id. § 262(Z)(9)(C) (emphases added). Additionally, 35 U.S.C. § 271(e)(2)(C)(ii), as amended by the BPCIA, provides that:
It shall be an act of infringement to submit ... if the applicant for the application fails to provide the application and information required under section 351(Z)(2)(A) of such Act, an application seeking approval of a biological product for a patent that could be identified pursuant to section 351(i )(3)(A)(i) of such Act....
35 U.S.C. § 271(e)(2)(C)(ii) (emphasis added).[2]
*1355 Amgen argues that the language “shall provide” in paragraph (i)(2)(A) suggests that the information disclosure is mandatory, not merely permissible. Amgen contends that other provisions of the BPCIA refer to the information as “required” under paragraph (i)(2)(A) and also refer to non-disclosure as a failure to comply with the Act. Amgen argues that, by refusing to provide the required information, a subsection (k) applicant unlawfully evades the detection of process patent infringement and avoids an immediate infringement action under § 262(Z)(6). Amgen also argues that paragraph (l )(9)(C) is merely a limitation on declaratory judgment action, not a remedy, let alone the exclusive remedy, for noncompliance with paragraph (mm.
Sandoz responds that the “shall” provision in paragraph (i )(2)(A) is only a condition precedent to engaging in the information-exchange process of paragraphs (£ )(3) through (i)(6), not a mandatory requirement in all circumstances. Sandoz contends that this interpretation is consistent with the use of “shall” in paragraph (l )(6), which provides that the RPS “shall” file an infringement suit. Sandoz notes that this use of “shall” cannot mean that the RPS violates the statute if it chooses not to file an infringement suit. Sandoz also responds that, under the BPCIA, if a subsection (k) applicant does not disclose the information under paragraph (l )(2)(A), then the sponsor may file an infringement suit under paragraph (l )(9)(C) and obtain the information in discovery, which Amgen has done. Sandoz also contends that it did not act unlawfully by taking a path expressly contemplated by Congress and the BPCIA.
We conclude that, read in isolation, the “shall” provision in paragraph (l )(2)(A) appears to mean that a subsection (k) applicant is required to disclose its aBLA and manufacturing information to the RPS by the deadline specified in the statute. Indeed, the BPCIA refers to such information as “required” in other provisions. See 42 U.S.C. § 262(i)(l)(B)(i), (l)(9)(A), (l )(9)(C); 35 U.S.C. § 271(e)(2)(C)(ii). Particularly, paragraph (l )(l)(B)(i) provides that “[w]hen” a subsection (k) applicant submits an aBLA to the FDA, “such applicant shall provide ... confidential ac-' cess to the information required, to be produced pursuant to paragraph (2) and any other information that the subsection (k) applicant determines, in its sole discretion, to be appropriate” (emphases added). Thus, under the plain language of paragraph (l )(l)(B)(i), when an applicant chooses the abbreviated pathway for regulatory approval of its biosimilar product, it is required to disclose its aBLA and manufacturing information to the RPS no later than 20 days after the FDA’s notification of acceptance, but not when the “when” criterion is not met.
Such a reading of “shall” in paragraph (l )(2)(A) is supported by the use of “may” in paragraph (l )(2)(B), which provides that a subsection (k) applicant “may” provide additional information requested by the RPS by the statutory deadline. Paragraph (i)(2)’s use of “shall” in juxtaposition with “may” in the adjacent provision would appear to indicate that “shall” signals a requirement.
However, the “shall” provision in paragraph (i )(2)(A) cannot be read in isolation. In other provisions, the BPCIA explicitly contemplates that a subsection (k) applicant might fail to disclose the required information by the statutory deadline. It specifically sets forth the consequence for such failure: the RPS may bring an infringement action under 42 U.S.C. § 262(i )(9)(C) and 35 U.S.C. § 271(e)(2)(C)(ii). Those latter provisions indicate that “shall” in paragraph (l )(2)(A) does not mean “must.” And the BPCIA *1356 has no other provision that grants a procedural right to compel compliance with the disclosure requirement of paragraph (Z)(2)(A).
Under 35 U.S.C. § 271(e)(2)(C)(ii), filing a subsection (k) application and failing to disclose the required information under paragraph (Z)(2)(A) is an artificial “act of infringement” of “a patent that could be identified” pursuant to paragraph (l )(3)(A)(i). 42 U.S.C. § 262(0(9)(C) further provides that “[i]f a subsection (k) applicant fails to provide the application and information required under paragraph (2)(A),” then the RPS, but not the subsection (k) applicant, may bring a declaratory judgment action on “any patent that claims the biological product or a use of the biological product.”[3] As a direct consequence of failing to comply with paragraph (l )(2)(A), paragraph (l )(9)(C) bars the subsection (k) applicant from bringing a declaratory judgment action on patents that claim the biological product or its use.
Notably, both 42 U.S.C. § 262(0(9X0 and 35 U.S.C. § 271(e)(2)(C)(ii) are premised on a claim of patent infringement, and the BPCIA does not specify any non-patent-based remedies for a failure to comply with paragraph (Z)(2)(A). Once the RPS brings an infringement suit under those two provisions, it can access the required information through discovery.[4]
Importantly, mandating compliance with paragraph (i)(2)(A) in all circumstances would render paragraph (Z)(9)(C) and 35 U.S.C. § 271(e)(2)(C)(ii) superfluous, and statutes are to be interpreted if possible to avoid rendering any provision superfluous. Marx v. Gen. Revenue Corp., 568 U.S. -, 133 S.Ct. 1166, 1178, 185 L.Ed.2d 242 (2013) (“[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.”); TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (“It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” (internal quotation marks omitted)).
Moreover, 35 U.S.C. § 271(e)(4) provides “the only remedies which may be granted by a court for an act of infringe- . ment described in paragraph (2)” (emphasis added). Under § 271(e)(2)(C)(ii), filing a subsection (k) application and failing to provide the required information under paragraph (Z)(2)(A) is such an act of infringement. Here, Amgen alleged that Sandoz violated the BPCIA, but the alleged violation is precisely an act of infringement under § 271(e)(2)(C)(ii), for which § 271(e)(4) provides the “only remedies.”
*1357 We therefore conclude that, even though under paragraph (Z)(2)(A), when read in isolation, a subsection (k) applicant would be required to disclose its aBLA and the manufacturing information to the RPS by the statutory deadline, we ultimately conclude that when a subsection (k) 'applicant fails the disclosure requirement, 42 U.S.C. § 262(Z)(9)(C) and 35 U.S.C. § 271(e) expressly provide the only remedies as those being based on a claim of patent infringement. Because Sandoz took a path expressly contemplated by the BPCIA, it did not violate the BPCIA by not disclosing its aBLA and the manufacturing information by the statutory deadline.
II.
We next consider whether the district court erred in concluding that a subsection (k) applicant may satisfy its obligation to give notice of commercial marketing under 42 U.S.C. § 262(Z)(8)(A) by doing so before the FDA licenses its product. Paragraph (Z )(8)(A) provides that “[t]he subsection (k) applicant shall provide notice to the reference product sponsor not later than 180 days before the date of the first commercial marketing of the biological product licensed under subsection (k).” Id. § 262(Z)(8)(A) (emphases added).
a.
Amgen argues that a subsection (k) applicant may give notice of commercial marketing only after it has a “biological product licensed under subsection (k),” meaning only after the FDA has licensed the biosimilar product. Amgen notes that elsewhere subsection (l) refers to the biosimilar product as “the biological product that is the subject of’ the application, which supports its interpretation of “licensed” in paragraph (Z)(8)(A). Amgen explains that giving notice after FDA li-censure provides time for the RPS to seek a preliminary injunction and to resolve patent disputes in a timely fashion. Am-gen contends that allowing the applicant to give notice before FDA licensure is irreconcilable with the statute’s text and purpose.
Sandoz responds that the plain terms of the notice provision are satisfied when an applicant provides notice at least 180 days before it commercially markets its product. According to Sandoz, the word “licensed” only means that, at the time of commercial marketing, the product must be licensed, but it does not limit the timing of the notice, which can be given before FDA licensure. Sandoz also argues that Am-gen’s construction of the notice provision would transform it into an automatic, additional, six-month bar against marketing of every licensed biosimilar product, which improperly extends the twelve-year exclusivity period under § 262(k)(7)(A).
We agree with Amgen that, under paragraph (Z )(8)(A), a subsection (k) applicant may only give effective notice of commercial marketing after the FDA has licensed its product. The statutory language compels such an interpretation. It means that notice, to be effective under this statute, must be given only after the product is licensed by the FDA.
In subsection (Z), only paragraph (Z )(8)(A) refers to the product as “the biological product licensed under subsection (k).” In other provisions of subsection (Z), the statute refers to the product as “the biological product that is the subject of’ the application, even when discussing its commercial marketing. -E.g., 42 U.S.C. § 262(Z )(3)(B)(ii)(I), (Z)(3)(C); id. § 262(Z )(1)(D), (Z )(2)(A), (Z )(3)(A)(i), (Z )(3)(B)(i), (Z)(7)(B). If Congress intended paragraph (Z)(8)(A) to permit effective notice before the product is licensed, it would have used the “subject of’ language.
While it is true that only a licensed product may be commercially marketed, it *1358 does not follow that whenever the future commercial marketing of a yet-to-be licensed product is discussed, it is the “licensed” product. It is not yet “the licensed product.” Congress could have used the phrase “the biological product that is the subject of’ the application in paragraph (l )(8)(A), as it did in other provisions, but it did not do so. See, e.g., Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).
We believe that Congress intended the notice to follow licensure, at which time the product, its therapeutic uses, and its manufacturing processes are fixed. When a subsection (k) applicant files its aBLA, it likely does not know for certain when, or if, it will obtain FDA licensure. The FDA could request changes to the product during the review process, or it could approve some but not all sought-for uses. Giving notice after FDA licensure, once the scope of the approved license is known and the marketing of the proposed biosimilar product is imminent, allows the RPS to effectively determine whether, and on which patents, to seek a preliminary injunction from the court.
Requiring that a product be licensed before notice of commercial marketing ensures the existence of a fully crystallized controversy regarding the need for injunc-tive relief. It provides a defined statutory window during which the court and the parties can fairly assess the parties’ rights prior to the launch of the biosimilar product. If a notice of commercial marketing could be given at any time before FDA licensure, the RPS would be left to guess the scope of the approved license and when commercial marketing would actually begin. Indeed, filing an aBLA only suggests that a subsection (k) applicant intends to commercially market its product someday in the future.
Furthermore, requiring FDA licensure before notice of commercial marketing does not necessarily conflict with the twelve-year exclusivity period of § 262(k)(7)(A). It is true that in this case, as we decide infra, Amgen will have an additional 180 days of market exclusion after Sandoz’s effective notice date; that is because Sandoz only filed its aBLA 23 years after Amgen obtained FDA approval of its Neupogen product. Amgen had more than an “extra” 180 days, but that is apparently the way the law, business, and the science evolved. That extra 180 days will not likely be the usual case, as aBLAs will often be filed during the 12-year exclusivity period for other products. A statute must be interpreted as it is enacted, not especially in light of particular, untypical facts of a given case. Finally, it is counterintuitive to provide that notice of commercial marketing be given at a time before one knows when, or if, the product will be approved, or licensed.
We therefore conclude that, under paragraph (i)(8)(A), a subsection (k) applicant may only give effective notice of commercial marketing after the FDA has licensed its product. The district court thus erred in holding that a notice of commercial marketing under paragraph (i)(8)(A) may effectively be given before the biological product is licensed, and we therefore reverse its conclusion relating to its interpretation of § 262(i )(8)(A) and the date when Sandoz may market its product.
b.
We next consider the consequence in this case of our interpretation of paragraph (i)(8)(A). Paragraph (Z)(8)(A) provides that the subsection (k) applicant “shall provide” notice of commercial marketing to the RPS no later than 180 days before commercial marketing of the licensed product. As we have concluded, an operative notice of commercial marketing can only be given after FDA licensure. *1359 Here, Sandoz’s notice in July 2014, the day after the FDA accepted its application for review, was premature and ineffective. However, the FDA approved Sandoz’s aBLA on March 6, 2015, and Sandoz gave a “further” notice of commercial marketing on that day. J.A. 1774. These facts are uncontested. Oral Argument at 35:33-56, Amgen Inc. v. Sandoz Inc., No. 2015-1499 (Fed.Cir. June 3, 2015), available at http:// www.cafe.uscourts.gov/oral-argument-recordings/15-1499/all. That notice in March 2015 thus serves as the operative and effective notice of commercial marketing in this case.
A question exists, however, concerning whether the “shall” provision in paragraph (l )(8)(A) is mandatory. We conclude that it is. Both paragraph (l )(2)(A) and (Z )(8)(A) use the word “shall,” which presumptively signals a statutory requirement. See, e.g., Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 661-62, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007); Lopez v. Davis, 531 U.S. 230, 241, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). As we have noted with respect to paragraph (Z)(2)(A), however, the BPCIA explicitly contemplates that a subsection (k) applicant might fail to comply with the requirement of paragraph (l)(2)(A) and further specifies the consequence for such failure in 42 U.S.C. § 262(1 )(9)(C) and 35 U.S.C. § 271(e)(2)(C)(ii). Because of those explicit statutory provisions, and to avoid construing the statute so as to render them superfluous, we have interpreted the BPCIA as allowing noncompliance with paragraph (Z)(2)(A), subject to the consequence specified in those other provisions.
In contrast, with respect to paragraph (Z)(8)(A), we do not find any provision in the BPCIA that contemplates, or specifies the consequence for, noncompliance with paragraph (Z)(8)(A) here, which would be the case if Sandoz attempts to launch in disregard of the requirement of paragraph (l )(8)(A), as we have interpreted it. San-doz argues that § 262(Z )(9)(B) does specify the consequence for noncompliance with paragraph (l)(8)(A). Paragraph (Z)(9)(B), entitled “[subsequent failure to act by subsection (k) applicant,” provides that:
If a subsection (k) applicant fails to complete an action required'of the subsection (k) applicant under paragraph (3)(B)(ii), paragraph (5), paragraph (6)(C)(i), paragraph (7), or paragraph (8) (A), the reference product sponsor, but not the subsection (k) applicant, may bring an action under section 2201 of Title 28, for a declaration of infringement, validity, or enforceability of any patent included in the list described in paragraph (3) (A), including as provided under paragraph (7).
42 U.S.C. § 262(Z )(9)(B) (emphases added).
While it is true that paragraph (Z )(9)(B) specifies the consequence for a subsequent failure to comply with paragraph (Z )(8)(A) after the applicant has complied with paragraph (Z)(2)(A), it does not apply in this case, where Sandoz did not comply with paragraph (Z)(2)(A) to begin with. Indeed, the consequence specified in paragraph (Z )(9)(B) is a declaratory judgment action brought by the RPS based on “any patent included in the list described in paragraph (3)(A), including as provided under paragraph (7).” 42 U.S.C. § 262(Z )(9)(B). Here, however, because Sandoz did not provide the required information to Amgen under paragraph (Z )(2)(A), Amgen was unable to compile a patent list as described in paragraph (Z )(3)(A) or paragraph (Z )(7).
Paragraph (Z)(8)(A) is a standalone notice provision in subsection (Z), and Sandoz concedes as much. Oral Argument at 39:30-52, Amgen Inc. v. Sandoz Inc., No. 20151499 (Fed.Cir. June 3, 2015), available at http://www.cafc.uscourts.gov/oral- *1360 argument-recordings/15-1499/all. Unlike the actions described in paragraphs (Z )(3) through (Z )(7), which all depend on, or are triggered by, the disclosure under paragraph (Z )(2)(A), nothing in paragraph (l )(8)(A) conditions the notice requirement on paragraph (Z )(2)(A) or other provisions of subsection (Z). Moreover, nothing in subsection (Z) excuses the applicant from its obligation to give notice of commercial marketing to the RPS after it has chosen not to comply with paragraph (Z)(2)(A). The purpose of paragraph (Z)(8)(A) is clear: requiring notice of commercial marketing be given to allow the RPS a period of time to assess and act upon its patent rights.
We therefore conclude that, where, as here, a subsection (k) applicant completely fails to provide its aBLA and the required manufacturing information to the RPS by the statutory deadline, the requirement of paragraph (Z )(8)(A) is mandatory. Sandoz therefore may not market Zarxio before 180 days from March 6, 2015, i.e., September 2, 2015.
III.
We next consider Amgep’s unfair competition and conversion claims under California law. After finding that Sandoz did not violate the BPCIA, the district court dismissed Amgen’s state law claims with prejudice. We affirm the dismissal based on our interpretation of the BPCIA.[5]
a.
Under Cal. Bus. & Prof.Code § 17200, “unfair competition” includes “any unlawful, unfair or fraudulent business act or practice.” Amgen’s unfair competition claim is based solely on the “unlawful” prong, which requires a showing that Sandoz acted unlawfully by violating another law, here, according to Amgen, the BPCIA. Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir.2012); see also Farmers Ins. Exch. v. Superior Court, 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730, 734 (1992). Under California law, UCL remedies are not available when the underlying law expressly provides that the remedies in that law are exclusive. See Cal. Bus. & Prof.Code § 17205; Loeffler v. Target Corp., 58 Cal.4th 1081, 171 Cal.Rptr.3d 189, 324 P.3d 50, 76 (2014).
As one basis of its unfair competition claim, Amgen alleges that Sandoz violated the BPCIA by failing to comply with § 262(Z )(2)(A). As we have concluded, Sandoz did not violate the BPCIA by not disclosing its aBLA and the manufacturing information according to § 262(Z )(2)(A). Sandoz took a path expressly contemplated by 42 U.S.C. § 262(Z)(9)(C) and 35 U.S.C. § 271(e)(2)(C)(ii), and 35 U.S.C. § 271(e)(4) provides “the only remedies which may be granted by a court” for the alleged violation. We therefore affirm the dismissal of Amgen’s unfair competition claim based on the alleged violation of § 262(Z )(2)(A).
b.
As another basis of its unfair competition claim, Amgen also asserts that Sandoz violated the BPCIA by giving a premature, ineffective, notice of commercial marketing under § 262(Z)(8)(A) in July 2014, before FDA approval in March 2015. As indicated, under our interpretation of the BPCIA, the July 2014 notice is ineffective, and Sandoz gave the operative notice on March 6, 2015. Thus, as we have indicated, San-doz may not market Zarxio before 180 days from March 6, 2015, ie., September *1361 2, 2015. And, as indicated below, we will extend the injunction pending appeal through September 2, 2015. Amgen’s appeal from the dismissal of its unfair competition claim based on the alleged violation of § 262(i)(8)(A) is therefore moot.
c.
We now turn to Amgen’s conversion claim. To sustain a claim for conversion under California law, Amgen must demonstrate: (1) its ownership or right to possession of the property; (2) Sandoz’s conversion by a wrongful act or disposition of property rights; and (3) damages. Burlesci v. Petersen, 68 Cal.App.4th 1062, 80 Cal.Rptr.2d 704, 706 (1998). Amgen asserts that Sandoz wrongfully used Am-gen’s approved license on Neupogen by filing an aBLA referencing Neupogen but refusing to provide Amgen the benefits to which it is entitled under § 262(l). San-doz responds that Amgen failed to show any “wrongful act” or to establish an exclusive ownership interest in the approved license on Neupogen to exclude Sandoz’s aBLA.
We agree with Sandoz that Amgen failed to establish the requisite elements to sustain a claim of conversion under California law. As indicated, the BPCIA explicitly contemplates that a subsection (k) applicant might not disclose its aBLA and the manufacturing information by the statutory deadline, and provides that the RPS may sue for patent infringement, which Amgen has done. Amgen thus failed to show a “wrongful act.”
Moreover, the BPCIA established the abbreviated pathway for FDA approval of follow-on biological products, allowing a subsection (k) applicant to use “publicly-' available information” regarding the reference product in its application.[6] 42 U.S.C. § 262(k)(2). The BPCIA also grants a 12-year exclusivity period to the RPS, during which approval of a subsection (k) application may not be made effective. Id. § 262(k)(7)(A). Neupogen’s 12-year exclusivity period has long expired. Amgen therefore fails to show that it has an exclusive right to possession of its approved license on Neupogen to sustain its claim of conversion under California law.
We therefore affirm the dismissal of Amgen’s unfair-competition and conversion claims based on our interpretation of the relevant provisions of the BPCIA.
IV.
Amgen argues that the district court erred in denying its motion for a preliminary injunction based on an incorrect reading of the BPCIA and an erroneous finding that Amgen failed to show irreparable harm. Sandoz responds that Amgen’s appeal is moot because it sought an injunction only until the district court decided the parties’ cross-motions for judgment on the plea’dings, which has already occurred. Sandoz also responds that, even if not moot, the district court did not abuse its discretion in denying the motion and did not clearly err in its factual findings.
We agree with Sandoz that Amgen’s appeal from the denial of a preliminary injunction is moot. In its motion for a pre-' liminary injunction, filed in the district court after it filed its motion for judgment on the pleadings, Amgen requested a preliminary injunction “until the Court de *1362 cides the parties’ motions for judgment on the pleadings,” and “if the Court resolves those motions in Amgen’s favor, until ... the parties have been placed in the position they would be in had Sandoz complied with the BPCIA.” Amgen Inc. v. Sandoz Inc., No. 14-cv-04741 (N.D. Cal. Feb. 5, 2015), ECF No. 56, at 25.
On March 19, 2015, the district court rendered its decision on the parties’ cross-motions for judgment on the pleadings, deciding against Amgen on the merits and dismissing Amgen’s state law claims with prejudice. In the same order, the court also denied Amgen’s motion for a preliminary injunction, which was based solely on its state law claims. Because Amgen only requested a preliminary injunction until the district court decided the parties’ motions for judgment on the pleadings, and the district court has resolved those motions against Amgen, Amgen’s appeal from the denial of a preliminary injunction is moot. We therefore dismiss that aspect of Amgen’s appeal.
V.
After the district court granted partial judgment on the pleadings in favor of San-doz and denied Amgen’s motion for a preliminary injunction, Amgen sought an injunction pending appeal, which the district court denied. Amgen then filed an emergency motion in this court for an injunction pending appeal. We granted the motion. In light of what we have decided concerning the proper interpretation of the contested provisions of the BPCIA, we accordingly order that the injunction pending appeal be extended through September ,2, 2015.
C. CONCLUSION
For the foregoing reasons, we affirm the dismissal of Amgen’s unfair competition and conversion claims, vacate the district court’s judgment on Sandoz’s counterclaims interpreting the BPCIA, and direct the district court to enter judgment on those counterclaims consistent with this opinion. We also remand for the district court to consider the patent infringement claim and counterclaims relating to the '427 patent and any other patents properly brought into the district court action.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED
Costs
Each party shall bear its own costs.

. Winston Churchill once described Russia as "a riddle wrapped in a mystery inside an enigma.” Winston Churchill, The Russian Enigma (BBC radio broadcast Oct. 1, 1939), available at http://www.churchill-society-london.org.uk/RusnEnig.html. That is this statute. In these opinions, we do our best to unravel the riddle, solve the mystery, and comprehend the enigma.

. Section 351(Z)(2)(A) of the Public Health Act corresponds to 42 U.S.C. § 262(1 )(2)(A).

. While it is true that 42 U.S.C. § 262(Z )(9)(C) premises the declaration judgment action on "any patent that claims the biological product or a use of the biological product ” (emphasis added), which does not appear to include process patents, 35 U.S.C. § 271(e)(2)(C)(ii) does contemplate an infringement action based on "a patent that could be identified pursuant to [paragraph] (l)(3)(A)(i) ." (emphasis added), which does not exclude process patents. Section 271(e)(2)(C)(ii) allows the RPS to assert process patents, "if the [subsection (k) ] applicant ... fails to provide the application and information” and "the purpose of [the subsection (k) ] submission is to obtain approval ... to engage in the commercial manufacture, use, or sale of a ... biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.” 35 U.S.C. § 271(e)(2).

. In addition, we note the existence of a re-buttable presumption in actions alleging infringement of a process patent under 35 U.S.C. § 271(g) relating to importation of products made abroad by a patented process. See, e.g., Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1314 (Fed.Cir.2011) (citing 35 U.S.C. § 295).

. In its cross-motion for judgment on the pleadings, Sandoz did not argue preemption as a defense to Amgen’s state law claims, and thus the district court did not consider that issue. We therefore do not address preemption in this appeal.

. Amgen emphasizes in its briefs that Sandoz is wrongfully benefitting from Amgen's establishment of the safety and efficacy of filgras-tim. Be that as it may, this is not the first time that Congress has allowed generic applicants to benefit from the early work of innovators. See Hatch-Waxman Act, Pub.L. No. 98-417, 98 Stat. 1585 (1984); see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). That was a decision that Congress was entitled to make and it did so.